UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STV ASIA LTD., | No. C-06-1664 JCS |
| Plaintiff, | **ORDER DENYING MOTION TO DISQUALIFY MORRISON & FOERSTER AND GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO STRIKE, OR FOR LEAVE TO FILE SUR-REPLY OPPOSING PLAINTIFF'S MOTION TO DISQUALIFY [Docket Nos. 23, 42]** |
| v. | |
| PRN CORPORATION ET Al., | |
| Defendants. | |

## I. INTRODUCTION

Plaintiff has filed a Motion to Disqualify Morrison & Foerster ("the Motion"), asserting that Morrison & Foerster's representation of Defendants is adverse to a former client, NBL Communications, and therefore, that firm should be disqualified from representing Defendants. The Motion came on for hearing on Friday, June 16, 2006 at 9:30 a.m. For the reasons stated below, the Motion is DENIED.

## II. BACKGROUND

### A. Facts

In this action, STV Asia Ltd. ("STV Asia") asserts that two of its patents have been infringed: U.S. Patent No. 5,983,069 ("the '069 patent"), entitled "Point of Purchase Video Distribution System," and U.S. Patent No. 5,412,416 ("the '416 patent"), entitled "Video Media Distribution Network Apparatus and Method." Complaint at 2. STV Asia acquired all rights, title and interest in these patents by virtue of an assignment after their original owner, NBL Communications, Inc. ("NBL"), dissolved. *See* Supplemental Declaration of Dr. S. K. Kim in Support of Motion to Disqualify Morrison & Foerster ("Kim Supp. Decl."), ¶¶ 7-9. In particular,

NBL assigned its interest in what would become the '416 patent to Credit Managers Association of California ("Credit Managers") in January 1995; Credit Managers assigned its interests in the '416 patent to Bylon Company Limited ("Bylon") in July 1995; and Bylon assigned its interest to STV Asia in August 1997. *See* Declaration of Vanina Sucharitkul in Support of Defendants' Opposition to Motion to Disqualify ("Sucharitkul Decl."), ¶ 10 & Ex. C (assignment history of '416 patent). The '069 patent was issued to STV Asia in 1999 and is a continuation subject to a terminal disclaimer of U.S. Patent No. 5,566,353 ("the '353 patent"), which, like the '416 patent, was assigned by NBL to Credit Managers in January 1995, from Credit Managers to Bylon in July 1995 and from Bylon to STV Asia in August 1997. *Id*., ¶ 11 & Ex. D (assignment history of the '069 patent).

NBL was formed in October 1991 by Frank Nemirofsky. *See* Declaration of Frank Nemirofsky in Support of Motion to Disqualify Morrison & Foerster ("Nemirofsky Decl."), ¶ 3. Nemirofsky "originated and initially developed the commercial, technical and strategic concept on which NBL was based, namely a point of purchase video system to transmit advertisements and other content to retail stores." *Id*., ¶ 5. Between October 1991 and June 1993, Nemirofsky served variously as NBL's president and chairman of its board of directors. *Id*., ¶ 3. Nemirofsky was also the inventor on the '416 patent, which he assigned to NBL on September 24, 1992, and on another patent that he assigned to NBL, U.S. Patent No. 5,761,601 ("the '601 patent"), involving a similar technology. *Id*., ¶¶ 8-10.

Between 1992 and 1994, NBL was represented by the law firm of Morrison & Foerster ("Morrison") in various matters relating to "the capitalization, development and commercialization of NBL's media distribution network and related technology." Nemirofsky Decl., ¶ 11. These included strategic relationships negotiated with Bonneville International Corporation ("Bonneville") and STV Asia. *Id*., ¶¶ 14, 20.

NBL entered into an interim agreement with Bonneville on December 3, 1992 ("the Services Agreement") and a formal "Strategic Relationship Agreement" on April 30, 1993. *Id*. at ¶¶ 14, 16. Under these agreements, Bonneville was to provide, among other things, beta testing and programming content for NBL's store television network. *Id*., ¶ 17. Morrison partner Gavin

2

Grover represented NBL in the Bonneville negotiations and Nemirofsky states that in connection with the representation, he disclosed to Grover and Morrison "confidential and proprietary information relating to the technology now at issue in this lawsuit, including . . . use of satellite transmission, terrestrial equipment requirements, applicability and viability of the advertising insertion switch developed by NBL, and other technical requirements of NBL's, and now STV Asia's technology." *Id*., ¶ 18.

According to Nemirofsky, Morrison's Gavin Grover participated in many NBL Board meetings "where confidential, proprietary, and technical aspects of NBL's technology (including patent applications) were discussed." Nemirofsky Supp. Decl., ¶ 4. Nemirofsky further states that he personally provided Grover with a copy of NBL's patent applications. *Id*., ¶ 3. Finally, Nemirofsky states that Morrison represented him as an individual, pointing to – as "but one example" – a lawsuit involving a compensation dispute by a former officer of NBL, Gerald Welch. *Id*., ¶ 6.

NBL entered into a Definitive Strategic Relationship Agreement ("Strategic Agreement") with STV Asia on February 26, 1993. *Id*., ¶ 20. Under that agreement, NBL granted STV Asia the exclusive right to market NBL's "store television concept" throughout Asia. *Id*., ¶ 21.

STV Asia was created by Dr. S. K. Kim in order to exploit NBL's technology in Asia. Declaration of Dr. S. K. Kim in Support of Motion to Disqualify Morrison & Foerster ("Kim Decl."), ¶ 5. Beginning in February 1993, Dr. Kim and a company he now controls named Kimbaco, invested over $12 million in NBL, making Kim NBL's majority shareholder. *Id*., ¶ 4. In addition, under the Strategic Agreement, Dr. Kim was appointed as a director of NBL. *Id*., ¶ 9. Dr. Kim states that it was his understanding that under the Strategic Agreement he was "becoming a partner with NBL and that STV Asia would be the exclusive licensee of NBL's technology in Asia." *Id*., ¶ 8.

As director of NBL, Dr. Kim was familiar with NBL's business and assets. Kim Supp. Decl., ¶ 3. According to Dr. Kim, the intellectual property embodied in the '416 patent, the '601 patent and the '069 patent "comprised substantially all of NBL's assets."[1] *Id.*, ¶ 5.

On January 10, 1995, NBL assigned its assets, excluding leases and leasehold interests in real estate, to Credit Managers Association of California ("Credit Managers") after NBL became "financially unworkable" and dissolved. Kim Supp. Decl., ¶ 7 & Ex. A (General Assignment).

At an undisclosed time after NBL dissolved, STV Asia "decided to continue the business of NBL and set forth on acquiring substantially all the assets and intellectual capital needed to continue the business that NBL started." Kim Supp. Decl., ¶ 9. As part of this process, STV Asia acquired the rights to the '416, '069 and '601 patents.[2] *Id.* It is also "gather[ing] a new management group and is [in] the process of forming the corporate structure" for STV America which, in turn, is negotiating with "several well known media companies" to become licensor of NBL's technology. *Id.*, ¶ 10. One of STV's directors is former NBL president and CEO Nemirofsky. Supplemental Declaration of Frank Nemirofsky in Support of Motion to Disqualify Morrison & Foerster ("Nemirofsky Supp. Decl."), ¶ 1.

**B.     The Motion**

In the Motion, STV Asia argues that Morrison is precluded from representing Defendants under California Ethics Rule 3-310(E). According to STV Asia, this rule is violated because Morrison, and particularly Gavin Grover, obtained confidential information about the patents at issue in this case through its representation of NBL. Anticipating Morrison's objection that STV Asia does not have standing to bring the motion because it did not itself have an attorney client

---

[1]In his original declaration, Kim described NBL's assets somewhat differently, stating that "NBL's technology included a portfolio of assigned patent applications and other confidential and proprietary information that related to a point of purchase video system to transmit advertisements and other content to retail stores." Kim Decl., ¶ 11.

[2]As noted above, the assignment history of the '416 patent indicates it was assigned by NBL to Credit Managers in January 1995, by Credit Managers to Bylon in July 1995, and by Bylon to STV Asia in August 1997. The '069 patent is a continuation subject to a terminal disclaimer of a patent that has the same assignment history as the '416 patent. The assignment history of the '601 patent is not in the record. The only evidence in the record regarding the '601 patent indicates that it was assigned to Credit Managers in 1995 and that it was acquired by STV Asia at some later, undisclosed date.

4

1 relationship with Morrison, STV Asia asserts that the Court has inherent authority to disqualify
2 counsel in order to maintain public confidence in the legal profession.

3 Defendants argue that Rule 3-310(E) does not apply here because STV Asia has never had an
4 attorney client relationship with Morrison and further, that this is not just a question of standing but
5 rather, goes directly to the question of whether Morrison's representation of Defendants presents an
6 ethical problem. Defendants make three specific arguments in support their position that STV Asia
7 may not claim an attorney-client relationship with Morrison. First, they point to cases holding that
8 the attorney client relationship does not transfer with a patent assignment, relying in particular on a
9 case addressing this issue decided by the Federal Circuit, *Telectronics Proprietary, Ltd. v.*
10 *Medtronics, Inc.,* 836 F.2d 1332 (Fed. Cir. 1988). Second, they cite to authority that a licensee is
11 not a party to a licensor's attorney client relationship. Third, Defendants rely on cases that hold that
12 a corporation's attorney client relationship does not belong to its officers, directors, or shareholders.
13 With respect to this last point, Defendants also provide a declaration stating that neither Nemirofsky
14 nor Kim was ever represented by Morrison as an individual. Finally, Defendants note that STV Asia
15 has not claimed to be a successor in interest to NBL and therefore cannot claim an attorney client
16 relationship on that basis. Rather, Defendants assert, any attorney client privilege that may have
17 arisen from Morrison's relationship with NBL no longer exists because NBL was dissolved.

18 In its Reply, STV Asia reiterates its assertion that even if Morrison's attorney client
19 relationship was with NBL rather than with STV Asia, Mo Fo should be disqualified because of the
20 danger that NBL's confidential communications will be disclosed improperly to Defendants in this
21 action. STV Asia rejects Defendants' assertion that NBL's attorney client privilege has terminated,
22 arguing that because NBL's assets were assigned to Credit Managers, that entity is entitled to assert
23 NBL's attorney client privilege. In addition, STV Asia argues for the first time that *it* is entitled to
24 assert NBL's attorney client privilege because it is NBL's successor in interest. Further, STV Asia
25 takes the position that Morrison's ethical wall is insufficient to protect NBL's confidential
26 information and that the review of documents conducted by Morrison is inadequate. Finally, STV
27 Asia provides declarations by Nemirofsky and Welch stating that Morrison represented Nemirofsky
28 as an individual in the Welch action.

5

In response to the new arguments raised in STV Asia's Reply, Morrison filed a Motion to Strike, or for Leave to File Sur-Reply Opposing Plaintiff's Motion to Disqualify ("the Motion to Strike"). That motion is granted in part and denied in part. In particular, the Court declines to strike STV Asia's Reply and supporting declarations but has considered Defendants' proposed sur-reply, which is deemed filed. The Court also permitted STV Asia to file a response to the sur-reply.

In the sur-reply, Defendants argue that Credit Managers is not entitled to assert NBL's attorney client privilege under California law. Even if it were, they assert, Morrison's representation of Defendants is not adverse to Credit Managers in any way and therefore, disqualification is not warranted. Defendants further assert that STV Asia is not a successor in interest to NBL and moreover, to the extent that NBL no longer exists, the attorney client privilege enjoyed by NBL has terminated. Defendants dispute the representations of Nemirofsky and Welch that Morrison represented Nemirofsky as an individual, pointing to court documents indicating that Nemirofsky was represented by the firm of Gorelick & Gorelick in that action rather than Morrison.

Finally, in its response to the sur-reply, STV Asia reiterates its earlier arguments that the court has inherent authority to disqualify Defendants' counsel even if Defendants' counsel never represented STV Asia, and that in any event, STV Asia is NBL's successor in interest. STV Asia further asserts that even if it isn't NBL's successor, Credit Managers *is* NBL's successor, establishing that NBL's attorney client privilege has not terminated.

### III.   ANALYSIS

#### A.   Legal Standard

The court has inherent supervisory authority to oversee the professional conduct of lawyers who appear before it, which includes the authority to disqualify an attorney in a case to maintain public confidence in the legal profession and protect the integrity of legal proceedings. *United States v. Bell*, 79 F. Supp. 2d 1169, 1174 (E.D. Cal. 1999). Motions to disqualify counsel are governed by state law. *In re County of Los Angeles*, 223 F.3d 990, 995 (9th Cir. 2000). In this case, it is undisputed that California law applies. In California, successive representation is governed by Rule 3-310(E) of the Professional Conduct rules. That rule provides as follows:

6

> A member shall not, without the informed written consent of the client or former client, accept employment adverse to the client or former client where, by reason of the representation of the client or former client, the member has obtained confidential information material to the employment.

Prof. Conduct, Rule 3-310(E). California courts have held that this rule only applies where the party seeking disqualification " was or is 'represented' by the attorney in a manner giving rise to an attorney-client relationship." *Koo v. Rubio's Restaurans, Inc.*, 109 Cal. App. 4th 719, 728 (2003) (quoting *Civil Service Comm'n of San Diego County v. Superior Court of San Diego County*, 163 Cal. App. 3d 70, 77 (1984)); *see also Alchemy II, Inc. v. Yes! Entertainment Corp.*, 844 F. Supp. 560, 564 (C.D. Cal. 1994) (holding that licensor of copyright was not entitled to disqualification of law firm representing defendant, even though firm had previously represented licensee in copyright infringement action against third parties). When such a relationship has been established, a "presumption that confidential information was shared with the attorney may arise where there exists a substantial relationship between the prior and present representation." *Alchemy*, 844 F. Supp. at 564 (citing *Global Van Lines, Inc. v. Superior Court of Orange County*, 144 Cal. App. 3d 483 (1983)). Thus, "[a]ctual possession of confidential information need not be proved to disqualify an attorney from representing the adversary of a former client in litigation against a former client." *Elliott v. McFarland Unified School District*, 164 Cal. App. 3d562, 569 (1985).

### B. Whether Morrison Should be Disqualified

STV Asia asserts that Morrison must be disqualified for two reasons: 1) the requirements of Rule 3-310(E) – including the existence of an attorney client relationship between Morrison and STV Asia – are satisfied; and 2) even if STV Asia cannot claim an attorney client relationship with Morrison, disqualification is warranted under the Court's inherent authority because of the risk that NBL's confidential communications will be disclosed in this action, thus jeopardizing public confidence in the legal profession and undermining the integrity of the legal proceeding. The Court is not persuaded by either position.

#### 1. Rule 3-310(E)

As noted above, Rule 3-310(E) requires that the moving party establish that it was (or is) in an attorney client relationship with the attorney that it is seeking to disqualify. Courts have held that

7

this requirement is *not* satisfied, in a patent infringement action, merely because the original owner of patents that were assigned to the moving party had an attorney client relationship with challenged counsel. *See Telectronics Proprietary, Ltd. v. Medtronics, Inc.*, 836 F.2d 1332 (Fed. Cir. 1988). In *Telectronics*, Medtronic owned patents that it licensed to Telectronics. 836 F.2d at 1334. These patents were originally owned by American Optical Corporation ("AO"), but were transferred to Medtronic through a series of assignments. *Id*. One of Medtronic's employees, Barouh Berkovits, was the former director of research and development at AO and also the inventor on one of the patents in suit. Medtronic alleged that Telectronics was infringing a number of these patents. *Id*. at 1333. Medtronic sought to disqualify Telectronic's attorneys because the same attorneys had represented AO in the prosecution of the patents in suit. *Id*. It would be improper and unfair, they asserted, for these attorneys to now represent Telectronics in challenging the validity of these patents. *Id*.

In determining whether Telectronics' attorneys should be disqualified, the court applied the law of the Second Circuit, which follows the ABA Code of Professional Responsibility ("the ABA Code"). *Id*. at 1336. Under Canon 4 of the ABA Code, disqualification of an attorney may be required where: 1) "the moving party is a former client of the adverse party's counsel;" 2) there is a "substantial relationship" between the current and the former representation; and 3) "the attorney whose disqualification is sought had access to, or was likely to have access to, relevant privileged information in the course of his prior representation of the client." *Id*. The court held that the first requirement was not met because Medtronic was not a former client – even though the original owner of the patent, AO, *was* a former client. *Id*. at 1336. In reaching this conclusion, the court relied on the general rule that an assignee of assets does not stand in the shoes of the assignor for the purposes of attorney client privilege. *Id*. The court further noted that Berkovits was not a "former client" because any confidences imparted to AO's attorneys by Berkovits were made as an employee of the corporation and only the corporation held any privilege as to those communications. *Id*. at 1336-1337.

8

An attorney client relationship also does not transfer to a licensee or strategic partner for the purposes of disqualification motions. *See Alchemy II, Inc. v. Yes! Entertainment Corp.*, 844 F. Supp. 560 (C.D. Cal. 1994). In *Alchemy II*, the plaintiff alleged copyright and trademark infringement claims as to a product to which it held a license. *Id*. at 563. The plaintiff sought to disqualify defendant's attorneys under Rule 3-310 on the basis that they previously had represented the licensor in actions seeking to protect the same copyrights. *Id*. at 565. Relying on *Telectronics*, the court held that Rule 3-310(E) did not apply because there was no attorney client relationship between the licensee, on one hand, and the licensor's counsel, on the other. *Id*. In fact, the court noted, the licensee and the licensor were often on opposite sides of the bargaining table and retained separate counsel. *Id*., n. 4.

Finally, where an attorney represents a corporation, the duties of counsel run to the corporation and not to the individual officers and shareholders of the corporation. *See Venture Law Group v. Superior Court*, 118 Cal. App. 4th 96, 105 (2004) (holding that individual directors, officers and shareholders were not clients of the corporation and could not control assertion of corporation's attorney client privilege). Thus, the mere fact that officers or shareholders of a corporation with whom counsel had an attorney client relationship are now parties to a lawsuit in which that same counsel represents the opposing side does not require disqualification.

On the other hand, where a corporation is a successor in interest to the corporation that formerly owned patents that are in issue in an infringement action, the successor may claim an attorney client relationship with the former corporation's counsel for the purposes of a disqualification motion. *See Graco Children's Products, Inc. v. Regalo International*, 1999 WL 553478 (E.D. Pa.) (granting motion to disqualify where moving party in patent infringement action was successor to original owner of patents and original owner had had attorney client relationship with attorneys whose disqualification was sought). This rule is based on the principal that "'when control of a corporation passes to new management, the authority to assert and waive the corporation's attorney client privilege passes as well.'" *In re Financial Corp. of America*, 119 B.R. 728, 736 (C.D. Cal. 1990) (quoting *Commodity Futures Trading Commission v. Weintraub*, 471 U.S.

343 (1985)); *see also* California Evidence Code § 953 (providing that the attorney client privilege is held by "[a] successor, assign, trustee in dissolution, or any similar representative of a . . . corporation . . . that is no longer in existence")." In contrast, "the mere sale of some of the corporation's assets does not necessarily transfer the corporation's attorney client privilege." *Id*.

Here, the Court concludes that STV Asia is not a successor to NBL and therefore cannot establish an attorney client relationship with Morrison on that basis. Notwithstanding the evidence showing that STV Asia obtained three NBL patents and that two key players from NBL now work for STV Asia, the evidence does *no*t reflect that NBL, as a business, was passed on, substantially intact, to STV Asia. In particular, even though STV Asia was in existence at the time of NBL's dissolution in 1995, there was no merger or agreement transferring ownership of NBL to STV Asia. Rather, the only evidence in the record is that STV Asia at some point obtained ownership of the '416, '069 and '601 patents. Evidence provided by Defendants shows that rights to the '416 patent were obtained in 1997 from Bylon, which in turn, obtained the rights to these patents from Credit Managers in 1995. The '069 patent issued to STV Asia in 1999 and is a continuation subject to a terminal disclaimer of a patent that has the same assignment history as the '416 patent. There is no evidence in the recording reflecting how or when STV Asia obtained the rights to the '601 patent.

There is no evidence that the business of STV Asia was transferred substantially intact from Credit Managers to Bylon to STV Asia. First, there is no evidence of what was included in the transfer from Credit Managers to Bylon. Was it a naked patent right, or did it include all intellectual property? Did it include any rights under the contracts entered into by NBL? Did it include any employees of NBL, or any of the liabilities of NBL? In short, there is insufficient evidence for Plaintiff to carry its burden that Bylon – let alone STV Asia – was the successor to NBL.

Similarly, there is a complete absence of specifics on the transfer between STV Asia and Bylon. What was transferred? Did it include any NBL employees or liabilities? Did it include NBL's contract rights? There is no evidence that the transaction even included the right to use NBL's name. Indeed, STV Asia's declarations are so general that it is impossible to determine whether it has actually acquired "substantially all the assets and intellectual capital needed to

10

continue the business that NBL had started," when those acquisitions occurred, and from whom they were obtained.

The cases cited by STV Asia do not support a contrary result. For example, in *In re Financial Corp.*, the court held that a receiver steps into the shoes of an insolvent institution. 119 B.R. at 736. That conclusion was based on a federal statute expressly providing that receivers succeed to all privileges of the insolvent institution. *Id*. at 737. Because STV Asia is not a receiver, the holding of *In re Financial Corp.*, does not apply here. *McCaugherty v. Siffermann* also does not apply because in that case, the entity asserting attorney client privilege had purchased the entire corporation. 132 F.R.D 234, 245 (N.D. Cal. 1990). Similarly, in *Graco Children's Products, Inc. v. Regalo International*, the party seeking to assert attorney client privilege acquired not only the corporation's assets pertaining to the accused product but also its operations in four locations, working capital and the right to use the corporation's brand name, 1999 WL 553478 (E.D. Pa.).

Finally, the Court concludes that *Soverain Software LLC v. The Gap, Inc.*, on which STV Asia relies heavily, is distinguishable. 340 F. Supp. 2d 760 (E.D. Tex. 2004). In that case, the court addressed whether the patent holder, Soverain, could claim attorney client privilege as to communications between the former owner of the patents in suit and their counsel. *Id*. To resolve this issue, the court addressed whether Soverain could be considered the corporate successor of the original patent owner, Transact. *Id*. at 763. In particular, it asked whether there had merely been a transfer of some assets or, alternatively, there was a transaction that resulted in "the transfer of control of the business and the continuation of the business under new management." *Id*. at 763. The court concluded that Soverain was a successor, explaining its conclusion as follows:

> Soverain not only acquired certain assets but also has continued to operate the Transact business. For example, . . .Soverain sells, as its principal business, the Transact product, retains the patents covering that product, and services customers with contracts to that product. . . .[E]ngineering personnel who supported the Transact product . . . continue to support that product for Soverain and . . . two of the inventors of the Transact patents are consultants to Soverain and are assisting Soverain in launching a new version of Transact.

*Id*. at 763. Here, in contrast to the facts in *Soverain*, there is a two year gap between the time NBL dissolved and the time STV Asia acquired NBL's patents. Further, as noted above, the evidence in the record concerning what NBL assets STV Asia acquired and how it obtained them is scant. Also,

11

there is no evidence that STV Asia continued to offer services to NBL's former customers or strategic partners, such as Bonneville, in contrast to the facts in *Soverain*.

Having concluded that STV Asia is not NBL's successor, the Court further holds that STV Asia has not established an attorney client relationship on any other grounds that would warrant disqualification of Morrison. First, under *Telectronics*, the assignment of NBL's patents to STV Asia is not sufficient to establish an attorney client relationship.[3] Second, under *Alchemy II*, STV Asia's licensing agreement and strategic relationship with NBL also is not sufficient to establish an attorney client relationship. Third, the fact that Nemirofsky and Kim were officers and shareholders of NBL do not allow them to claim an attorney client relationship with Morrison.[4]

Finally, the fact that Credit Managers may *have been*, at some point, a successor to NBL is of no moment. There is no evidence that Credit Managers currently owns any of the assets or liabilities of NBL and therefore it is not, presently, the successor to NBL. Moreover, there has been no showing that the current action is adverse to Credit Managers' interests.

Because STV Asia cannot claim an attorney client relationship with Morrison, Rule 3-310(E) does not require Morrison's disqualification.

---

[3] STV Asia asserts that *Telectronics* does not apply here because it applies the law of the Second Circuit rather than Rule 3-310(E). The Court does not agree. Although *Telectronics* applied the law of the Second Circuit rather than Rule 3-310(E), the specific issue that was addressed – whether there was an attorney client relationship under circumstances similar to those in this case – was essentially the same. Nor has STV Asia pointed to any cases that persuade the Court that on this particular question California courts would reach a different result. Indeed, the *Alchemy II* court, which was applying California law (specifically, Rule 3-310(E)), expressly relied on *Telectronics* in support of its conclusion.

[4] The parties have presented conflicting evidence regarding whether Nemirofsky was represented as an individual by Morrison in the Welch action. STV Asia says that he was, citing declarations by Nemirofsky and Welch stating that Morrison represented Nemirofsky. On the other hand, Defendants have provided copies of court documents indicating that Nemirofsky was represented by Gorelick & Gorelick in the Welch action. *See* Declaration of Alison Tucher in Support of Defendants' Sur-Reply Opposing Plaintiff's Motion to Disqualify ("Tucher Decl."), Exs. A-E. The Court concludes, based on this evidence, that Nemirofsky and Welch are mistaken and that Morrison did not represent Nemirofsky as an individual. Even if Morrison represented Nemirofsky during settlement discussions in the Welch cases, as STV Asia asserts, that representation does not require disqualification of Morrison here. First, Nemirofsky is not a party to this action. Second, there is no evidence that Morrison's representation of Nemirofsky in the Welch cases is substantially related to the issues in this case.

12

### 2. Inherent Authority of Court to Disqualify

STV Asia argues that even if it cannot assert an attorney client relationship with Morrison, its motion should be granted because the Court has the inherent authority to disqualify counsel where necessary to protect public confidence or the integrity of the judicial system. The Court rejects this argument for two reasons.

First, none of the cases cited by STV Asia in support of the court's inherent authority to disqualify suggest that in exercising this authority the court should disregard the requirements of Rule 3-310 in cases involving successive representations. *See Thomas v. Municipal Court*, 878 F.2d 285 (9th Cir. 1989) (holding that in a criminal case, there was a conflict where attorney who was defending husband in criminal action based on assault on wife had previously represented the wife in an action to set aside prior marriage); *United States v. Bell*, 79 F. Supp. 2d 1169 (E.D. Cal. 1999) (noting that court could disqualify counsel under inherent authority but denying motion to disqualify an Assistant United States Attorney by criminal defendant on grounds of alleged prosecutorial misconduct); *Schiffli Embroidery Workers Pension Fund v. Ryan, Beck & Co.*, 1994 WL 62124 (D.N.J) (holding that disqualification was required where a defendant was formerly a trustee of the plaintiff and where court found that the defendant's past relationship with the plaintiff's counsel while a trustee amounted to an attorney client relationship in its own right, independent of the attorney client relationship that existed with the plaintiff).

Second, STV Asia has not identified any specific confidential information in Morrison's possession that is at risk of being disclosed in this action. Nor has STV Asia identified any specific unfairness that will result from allowing Morrison to represent Defendants. Thus, disqualification is not necessary to protect public confidence or the integrity of the judicial process. Indeed, a Morrison attorney who reviewed the NBL files has found no technical information in their files and to the extent Nemirofsky says he gave Grover copies of the patent applications, those applications are no longer confidential because the patents have already issued. Nor is there authority that suggests STV Asia is entitled to a presumption that confidential communications are at issue, given that it has not established an attorney client relationship with Morrison. *See Telectronics*, 836 F.2d

at 1339 (holding that where there was no attorney client relationship, party moving for disqualification could not rely on presumption that confidences were disclosed in prior representation but rather had to show that specific unfair advantage requiring disqualification). Finally, Morrison has erected an ethical wall to ensure that NBL's confidences are not disclosed in this action. The Court finds these protections to be sufficient under the circumstances.[5]

**IV.  CONCLUSION**

The Motion is DENIED.

IT IS SO ORDERED.

Dated: June 22, 2006

_____
JOSEPH C. SPERO
United States Magistrate Judge

---

[5] Because the Court concludes that the risk of disclosure of NBL's confidences is not sufficient, under the circumstances, to justify disqualification of Morrison, it does not reach Morrison's argument that any privilege that may have existed as to NBL's confidential communications ended with NBL's dissolution.