United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

STV ASIA LTD.,

Plaintiff,

v.

PRN CORPORATION, ET AL.,

Defendants.

_______________________________________/

Case No. C-06-1664 JCS

**CLAIM CONSTRUCTION ORDER**
**[Docket Nos. 135-137]**

## I. INTRODUCTION

Plaintiff STV Asia Ltd. ("STV Asia") alleges that Defendants are infringing two patents that relate to in-store television networks: 1) United States Patent No. 5,412,416 ("the '416 patent"), entitled "Video Media Distribution Network Apparatus and Method," and 2) United States Patent No. 5,983,069 ("the '069 patent"), entitled "Point of Purchase Video Distribution System." The '416 patent was issued on May 2, 1995. The '069 patent was issued on November 9, 1999, and incorporates by reference the '416 patent. The parties have presented nine disputed claim terms for construction. The meaning of these disputed claim terms is a question of law that must be resolved by the Court. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995). A claim construction hearing was held on January 25, 2007.

## II. LEGAL STANDARD

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). Generally, claim terms are given the ordinary and customary meaning

United States District Court
For the Northern District of California

that would be ascribed to them by a person of ordinary skill in the field of the invention. *Id*. at 1313. The most "significant source of the legally operative meaning of disputed claim language" is the intrinsic evidence of record, that is, the claims, the specification and the prosecution history. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). This is because "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Phillips*, 415 F.3d at 1312. In some cases, the specification may reveal a "special definition" given by the inventor that differs from the meaning the term might otherwise possess. *Id*. at 1316. A specification may also reveal "an intentional disclaimer, or disavowal, of claim scope by the inventor." *Id*. A person of ordinary skill in the art also looks to the prosecution history of a patent to understand how the patent applicant and the Patent Office understood the claim terms. *Id*. at 1313, 1317.

While claims are to be construed in light of the specification, courts must be careful not to read limitations from the specification into the claim. *Phillips*, 415 F.3d at 1323. Thus, if a patent specification describes only a single embodiment, that does not mean the claims of the patent necessarily must be construed as limited to that embodiment. *Id*. Rather, it is to be understood that the purpose of the specification "is to teach and enable those of skill in the art to make and use the invention" and that sometimes, the best way to do that is to provide an example. *Id*. In *Phillips*, the Federal Circuit acknowledged, "the distinction between using the specification to interpret the meaning of a claim and importing limitations from the specification can be a difficult one to apply in practice." *Id*.

Courts may also use extrinsic evidence in construing claim terms if it is necessary, so long as such evidence is not used to "vary or contradict the terms of the claims." *Markman*, 52 F.3d at 980. The Federal Circuit has warned, however, that such evidence is generally "less reliable than the patent and its prosecution history." *Phillips*, 415 F.3d at 1318. Courts may consider expert testimony, the testimony of the inventor, and prior art, whether or not it is referenced in the specification or prosecution history. *Vitronics*, 90 F.3d at 1584. Courts are also free to consult dictionaries and technical treatises so long as they are careful not to elevate them "to such

prominence that it focuses the inquiry on the abstract meaning of the words rather than on the meaning of the claim terms within the context of the patent." *Phillips*, 415 F.3d at 1321-1322. As the court explained in *Markman*, "[extrinsic] evidence may be helpful to explain scientific principles, the meaning of technical terms, and terms of art that appear in the patent and prosecution history." 52 F.3d at 980.

## III. CLAIM CONSTRUCTIONS

### A. Disputed Claim Terms in the '416 Patent

The parties dispute three claim terms in the '416 patent: 1) "network-wide program" or "network-wide video program" (claims 1, 9, 38, 39);[1] 2) "market specific segments" (claims 1, 9, 38, 39); and 3) "means operative when the destination address matches the associated address of the receiving site for inserting the market-specific segments into the network-wide video program" (claim 1). These terms are used as follows:

claim 1

A video media distribution network comprising:

A central distribution center having means for transmitting a **network-wide video program** and **market-specific segments** to a plurality of receiving sites in stores each having an associated address, said **market-specific segments** including a destination address and a set of control data encoded therein, wherein the receiving sites comprise:

means for receiving said **network-wide video program** and said **market-specific segments**;

means for reading the destination address in said **market-specific segments**;

**means operative when the destination address matches the associated address of the receiving site for inserting the market-specific segments into the network-wide video program** according to commands contained in the control data to produce a customized program; and

means for displaying the customized program on television monitors in said stores.

claim 9

A network for distributing programs from a central distribution center to geographically dispersed retail stores, each store having an associated address, the network comprising:

means in the distribution center for playing back a **network-wide program** over a first channel;

[1] The parties have stipulated that "network-wide program" and "network-wide video program" should be given the same construction. *See* Defendants' Claim Construction Brief at 8, fn. 4.

United States District Court
For the Northern District of California

means in the distribution center for playing back **market-specific segments** over at least a second channel;

means in the distribution center for encoding the **market specific segments** with a destination address and a set of control data;

means for transmitting the **network-wide program** and **market-specific segments** to the stores;

a receiver in each store for receiving the **network-wide program** and **market-specific segments**, receiver having means for switching between said first and second channels;

a controller coupled to the receiver, the controller having means for reading the destination address and means for directing the receiver to switch between said first and second channels when the **market-specific segments** have a destination address corresponding to the store's associated address, and

at least one video display device coupled to the receiver for displaying the **network-wide program** with the **market specific segments** having the store's associated address inserted therein.

<u>claim 38</u>

A network for distributing video programs from a distribution center to geographically dispersed retail stores, each store having an associated address, the network comprising:

means in the distribution center for playing back a **network-wide program** over a first channel;

means in the distribution center for playing back **market-specific segments** over at least a second channel;

means in the distribution center for encoding the **market-specific segments** with a destination address and a set of control data, the means for encoding further encoding the destination address in the **network-wide program** at a point coinciding with the position of the destination address in the **market-specific segments**;

means for transmitting the **network-wide program** and **market-specific segments** to the stores;

a receiver in each store for receiving the **network-wide program** and **market-specific segments**, the receiver having means for switching between said first and second channels;

a controller coupled to the receiver, the controller having means for reading the destination address and means for directing the receiver to switch between said first and second channels when the **market-specific segments** have a destination address corresponding to the store's associated address; and

at least one video display device coupled to the receiver for displaying the **network-wide program** with the **market specific segments** having the store's associated address inserted therein.

claim 39

A method of broadcasting a plurality of customized video programs to a plurality of receiving sites in stores each having an associated address, the method comprising:

encoding each of a plurality of **market-specific segments** with a destination address;

transmitting a **network-wide program** and the **market-specific segments** to the receiving sites in said stores, the **network-wide program** being transmitted on a first channel and the market-specific segments being transmitted on a second channel;

receiving the **network-wide program** and **market-specific segments** at each site;

reading the destination address in each **market-specific segment**;

inserting the **market-specific segments** having a destination address matching the associated address into the **network-wide program** to produce the customized program; and

playing the segments on television monitors in said stores.

**1. "network-wide program" or "network-wide video program" (claims 1, 9, 38, 38)**

STV Asia asserts that this claim term should be construed as "system distributed material." Defendants, however, contend that STV Asia's proposed construction is too broad, reading out of the claim term the limitations requiring that the program be distributed *network-wide*, that is, to *all* the locations in the network. Defendants also assert that the word "material" is inconsistent with the patentee's use of the term "video program," encompassing not only audiovisual materials but also things that do not constitute video programs, such as text files and pictures. Defendants' proposed construction is: "a preassembled video program that is received in every retail location in the media distribution network, and that may then be shown as it is received or customized for specific locations in the network."

The Court addresses first the question of whether the term requires that the program be received at every location in the network. The Court concludes that it does. First, consistently throughout the specification, the "network-wide program" is described as the default programming, played at each location, into which the market-specific programming is inserted. The Abstract states that "[t]he distribution network provides automatic insertion of custom, store specific video segments . . . into a general, network-wide video program without the need for operational involvement of personnel at the receiving site . . . ." Similarly, in describing the specific

United States District Court
For the Northern District of California

embodiments, the inventors consistently describe a technology that provides a means of "customizing" the programs shown at the individual receiving sites by allowing insertion of market-specific segments into the network-wide program. *See, e.g.*,'416 patent, col. 4, ll. 33-41.

The claims also describe a system in which "customized programs" are created by inserting "market-specific segments" into a "network-wide program." *See, e.g.*, '416 patent, claim 1 (claiming an invention in which the "network-wide video program" is to be transmitted to "a plurality of receiving sites in stores" and in which there is a means to insert the "market-specific segments into the network-wide video program," resulting in the creation of a "customized program" to be displayed "in said stores"). If a network-wide program were sent to only *some* locations, the distinction between the network-wide program and the market-specific segments would be lost and the inventor's scheme for created customized programming would no longer make sense.

Further, in the patent prosecution, the inventors made clear that programming was tailored to the needs of the specific receiving sites by inserting market-specific material into a more general program that is received by all the locations. In particular, in seeking to overcome a rejection based on prior art, the inventors explained that in prior art, in order to "have the advertising be market or store specific, different tapes [had to] be mailed to the various store." Declaration of Shane Brun in Support of Defendants' Response to Plaintiff's Opening Brief on Claim Construction ("Brun Decl."), Ex. 4 (May 9, 1994 Amendment) at 6. They argued that the invention described in the '416 patent overcame these problems:

> . . . by providing a central location which transmits a network-wide program and market-specific segments to the participating stores. The market-specific segments are provided with an appropriate address. The stores play only those market-specific segments for which it/they have been addressed. This results in a fully tailored program being sent to each participating retail store.

*Id*. at 7.

The Court rejects STV Asia's assertion that a network-wide program need only be distributed to some retail locations. STV Asia relies on a single line in the specification in which the inventor states that the invention describes a "distribution network for transmitting . . . from a distribution center to a *multitude* of receiving sites, typically retail stores." '416 patent, col. 4, ll. 23-

United States District Court
For the Northern District of California

27 (emphasis added). While read in isolation, this statement might be read as allowing for transmission of "network-wide programs" to less than all of the receiving sites, such a reading is not supported by consideration of the patent specification as a whole. In particular, nowhere in the patent is there any indication that the inventor sought to describe a network-wide program that would be distributed to only *some* of the receiving centers. Nor has STV Asia cited anything in the patent history that would support such a construction.

STV Asia's proposed construction would seem to allow for situations in which a receiving center would receive *only* the market-specific material, in which case, the invention would no longer involve the insertion of market-specific material into a network-wide program to customize the program. This is not the invention described in the specification. Alternatively, STV Asia's proposed construction might allow for several "network-wide programs," such that each receiving center receives *one* of the network wide programs in addition to market-specific segments. In this scenario, the customization would result not only from insertion of the market-specific segments but also the choice of *which* network-wide program the receiving center received. Again, this is not the invention described in the patent, which draws a clear distinction between the market-specific segments used to "customize" and the network-wide material. There is simply no suggestion in the patent that the network-wide material is itself customized.

Finally, the dictionary definition of the word "wide" when used in the form used in the disputed claims of the '416 patent supports the conclusion that the term "network-wide" requires distribution to the entire network. In particular, *Merriam-Webster's Collegiate Dictionary* includes the following definition: "extending throughout a specified area or scope – usu. used in combination <nation*wide*> <industry-*wide*>." This usage is consistent with the inventor's description in the specification and the patent prosecution history. The Court concludes that the term "network-wide program" requires distribution of the program to every store location in the network.[2]

[2] At oral argument, the parties stipulated that the receiving sites in the '416 patent may be described as "stores."

United States District Court
For the Northern District of California

Next, the Court addresses whether a "network-wide program" or "network-wide video program" allows for STV Asia's use of the term "material" in its proposed construction. The Court concludes that it does not. The inventor used the term "*video* program" and explained in the specification that "[w]hile the term 'video' is used herein unaccompanied by the word 'audio' the term 'video' is intended to refer to recorded audio-visual media as in common usage." '416 patent, col. 5, ll. 14-18. As the inventor has provided a straightforward explanation for the term "video program," the Court finds no justification for adopting the more vague term proposed by STV Asia, which might arguably include formats that do not fall into the category of a *video* program.

The Court therefore construes the terms "network-wide program/network-wide video program" as follows: "a preassembled audiovisual program that is sent to every store location in the media distribution network."[3]

**2. "market-specific segments" (claims 1, 9, 38, 39)**

STV Asia proposes that the term "market-specific segment" be construed as "targeted material." Defendants argue that this term means "individual video segments, each encoded with a destination address (or addresses)." Defendants assert that STV Asia's proposed construction is incorrect because: 1) it fails to include the limitation that the segments must be encoded with the destination addresses; 2) it is overly broad in that it could include formats other than audiovisual media; and 3) it loses the sense of the word "segment,' which indicates that the market-specific segment is part of a broader video program. With respect to the last point, STV Asia argues that its use of the word "targeted" captures the sense that the market-specific segment is the "counterpart" of the network-wide program. STV Asia Opening Brief at 7.

With respect to the first issue, the Court concludes that its construction of this term should not include the limitation that each segment is "encoded with a destination address." That limitation is included elsewhere in the disputed claims. *See* claim 1 ("said market specific segments including

---

[3] The Court declines to include in its construction the phrase proposed by Defendants, "that may then be shown as it is received or customized for specific locations in the network." Defendants explained at oral argument that they included this language (which relates to other claim terms) in order to make their construction of the term easier for a jury to understand.

a destination address"); claim 9 ("means in the distribution center for encoding the market-specific segments with a destination address and a set of control data"); claim 38 ("encoding each of a plurality of market-specific segments with a destination address"). Where a limitation is contained elsewhere in a claim, it is generally inappropriate to read that limitation into a claim term. *See Phillips*, 415 F.3d at 1314. For example, in *Phillips*, the court noted that if a claim refers to a "steel baffle," then the word "baffle" alone should be construed as *not* being limited to steel. *See* 415 F.3d at 1314. Here, as in *Phillips*, it would be redundant to include the limitation that the term "market-specific segments" must be encoded with a destination address because that limitation is found elsewhere in the claims.

On the other hand, the Court concludes that the word "material" in STV Asia's proposed construction is overly broad. Rather, the Court agrees with STV Asia's statement in its Reply that market-specific segments are "all audiovisual material and are not limited to just video." Reply at 8 (citing '416 patent, col. 5, ll. 10-20). This construction is consistent with Defendants' position on this issue. Further, it is consistent with the Court's construction of "network-wide video program."

Finally, the Court declines to use the word "targeted," as requested by STV Asia, but instead concludes that a "market-specific segment" is better described as a segment that is "designed for a specific market."

The Court construes this term as follows: "individual audiovisual segments designed for specific markets within the network."

**3. "means operative when the destination address matches the associated address of the receiving site for inserting the market-specific segments into the network-wide video program" (claim 1)**

The parties agree that this claim term is a "means-plus-function" claim limitation that is construed under 35 U.S.C. § 112 ¶ 6. Under that provision, a court is required to: 1) identify the claimed function; and 2) identify the corresponding structure that performs that function. *JVW Enters., Inc. v. Interact Accessories, Inc.*, 424 F.3d 1324, 1330 (Fed. Cir. 2005).

The parties also appear to be largely in agreement about the function: STV Asia asserts that the function is "placing market specific segments into a network-wide program" while Defendants

United States District Court
For the Northern District of California

similarly state that the function is "inserting market-specific segments in the network-wide video program."

With respect to corresponding structure, Defendants list the following structures in their Claim Construction Brief:

1) decoding and switching system, Figure 1, element 12 and Figure 3;

2) digital data separator, Figure 4, element 54E;

3) insertion control unit, Figures 3, 4, 5, element 56;

4) video storage bank, Figure 3, element 72;

5) routing switcher, Figure 5, element 74 (Figure 3)

6) switching command decoder, Figure 4, element 54C;

7) multichannel output switcher Figure 4, element 54D;

8) data separator and buffer, Figure 5, element 58;

9) control channel data buffer, Figure 5, element 60;

10) processor, Figure 5, element 62;

11) non-volatile memory units, Figure 5, elements 64 and 66;

12) dial-up serial interface, Figure 5, element 68;

13) software of the insertion control unit, element 56 (Figures 8A, 8B, 8C, 8D, 8E and 8F);

14) receiver, Figure 3, element 54, and Figure 4;

15) source channels (analog or digital) (5:40-64, 6:52-7:9, 7:20 -37, 8:42-9:20).

Defendants' Claim Construction Brief at 12.

In its briefing, STV Asia disputed only the last two of these structures, that is, the receiver and source channels. In particular, STV Asia stated in its Reply brief that "[t]he specification discloses the following corresponding structures that accomplish the claimed function of 'inserting the market-specific segments into the network-wide program':

Decoding and Switching System (Element 12) – this includes:

Digital data separator (Element 54E)

Insertion Control Unit (Element 56)

Video Storage Bank (Element 72)

United States District Court
For the Northern District of California

Routing Switcher (Element 74)

Switching Command Decoder (Element 54C)

Multichannel Output Switcher (Element 54D)

Data Separator and Buffer (Element 58)

Control Channel Data Buffer (Element 60)

Processor (Element 62)

Non-volatile memory units (Element 64 and 66)

Dial-up serial interface (Element 68)

Software of the insertion control unit (Element 56)

. . .

*The parties agree that the corresponding structure for the means for 'inserting' should be construed to include the Decoding and Switching System 12 and its sub-units listed above.*" Reply at 5-6 (emphasis added). On the basis of this stipulation, the Court concludes that the structures listed by STV Asia in its Reply brief and replicated above constitute corresponding structure.[4]

Next, the Court considers whether the receivers and source channels should also be included as corresponding structures. The Court concludes that they should. The use of receiver 54 as a means for "inserting" in the analog embodiment of the invention is described in the specification at column 8, lines 42-60 ("[i]nsertion control unit 56 reads the switching command and switches receiver 54 to tune to the transmission channel (satellite transponder) of the market-specific segment at the appropriate time. At the end of the market-specific segment, the insertion control unit 56 will retune receiver 54 back to the network-wide program channel . . ."). The use of the source channels as a means for "inserting" in the digital embodiment is described in the specification between column 8, line 61 and column 9, line 15 ("[i]nsertion control unit 56 reads data obtained in the digital control data channel to determine whether an upcoming market-specific segment is to be played at the receiving site. If so, insertion control unit 56 switches receiver 54 from the network-

---

[4] At oral argument, STV Asia attempted to repudiate its prior stipulation, asserting for the first time that the only corresponding structure for this claim term was element 56. The Court has not had the benefit of any briefing on this new position, which it declines to consider at this time.

United States District Court
For the Northern District of California

wide program 20 digital source channel to the appropriate market-specific segment digital source channel through multi-channel output switcher 54D . . .").

For the reasons stated above, the Court construes this term as follows:

Function: "inserting market-specific segments in the network-wide video program."

Structures: decoding and switching system, element 12; digital data separator, element 54E; insertion control unit, element 56; video storage bank, element 72; routing switcher, element 74; switching command decoder, element 54C; multichannel output switcher, element 54D; data separator and buffer, element 58; control channel data buffer, element 60; processor, element 62; non-volatile memory units, elements 64 and 66; dial-up serial interface, element 68; software of the insertion control unit, element 56; receiver, element 54, source channels.

**B. Disputed Claim Terms in the '069 Patent**

The parties dispute six claim terms in the '069 patent: 1) "transmitting" (claims 1, 15, 16); 2) "network management system" (claims 1, 15); 3) "user" (claims 1, 15, 16); 4) "playlist" (claims 1, 15, 16); 5) "the network management system controlling when the video program is forwarded to the display unit for display" (claim 15); and 6) "network management site" (claim 16). These claim terms are used as follows:

claim 1

A video media distribution network comprising:

a distribution center for **transmitting** video program segments to a plurality of receiving sites;

receivers located at all the receiving sites;

a tracking system for automatically tracking product movement at the receiving sites;

a network management system forming **playlists** for each of the receiving sites in response to inputs from a **user**, the **user** having access to the product movement information from the tracking system; and

display units for displaying the **playlists** at the receiving sites.

claim 15

A video media distribution network comprising: a distribution center for **transmitting** video program segments to a plurality of receiving sites, the receiving sites having associated receiver addresses, said video program segments including both audio and visual components of at least one video program;

United States District Court
For the Northern District of California

> receivers, located at the receiving sites, for receiving and storing the video program segments;
>
> a **network management system** forming **playlists** for the receiving sites in response to inputs from a **user**, the **network management system** controlling which video program segments are sent to each of the receiving sites; and
>
> display units for displaying the video program from the video program segments at the receiving sites, **the network management system controlling when the video program is forwarded to the display unit for display**.
>
> <u>claim 16</u>
>
> A method of broadcasting video program segments to a plurality of stores, for display on video monitors in said stores, the method comprising:
>
> **transmitting** said program segments to said stores, said program segments including both audio and visual components of at least one video program;
>
> receiving said program segments at each store;
>
> storing said program segments at said stores;
>
> forming a desired **playlist** at a **network management site** in response to inputs from a **user**;
>
> **transmitting** said **playlist** to said stores; and
>
> playing back said stored program segments in said stores on said video monitors in an order determined by said desired **playlist**.

**1) "transmitting" (claims 1, 15, 16)**

STV Asia's proposed construction of this term is "electronic distribution." Defendants' proposed construction is "sending out (a signal) either by radio waves or by wire or optical fiber line." Here again, the dispute between the parties does not appear to be fundamental. Defendants reject STV Asia's proposed construction on the basis that it is ungrammatical, construing a verb with a noun. They also assert that it is ambiguous because an "electronic distribution" could, arguably, mean both something that is distributed by electronic means and the distribution of electronic content – not necessarily by electronic means (for instance, the mailing of DVDs). The latter meaning, Defendants assert, is not consistent with the specification or the claims. STV Asia stipulated at oral argument that "transmitting" does not mean distributing electronic material by non-electronic means. It argues, however, that Defendants proposed construction is too narrow because it limits transmissions to signals sent by radio waves, wire or optical fiber line.

At oral argument, the parties stipulated that this term may be construed as: "distributing by sending by an electronic signal."

**2) "network management system" (claims 1, 15)**

STV Asia proposes that this claim term be construed to mean "a program trafficking scheme for selecting and scheduling audiovisual material." Defendants argue that this term means "a combination of interacting hardware and software components centrally located in the distribution center that manages the network." The parties' proposed constructions reflect two areas of dispute.

First, there is disagreement about where the network management system is located. Defendants assert that STV Asia's use of the word "scheme" in its proposed construction suggests that the network management is merely a construct rather than a thing with a physical location. According to Defendants, such a construction is inconsistent with the specification, which indicates that the network management system is located in the network distribution center. STV Asia responds that a "scheme" can be a thing with a location but asserts that there is no support in the specification for Defendants' proposed construction to the extent that it requires the network management system to be "centrally" located in the distribution center. Further, STV Asia asserts that the network management system could be spread out over more than one location.

Second, Defendants assert that STV Asia's proposed construction impermissibly limits the network management system to the narrow activity of "selecting and scheduling" audiovisual material when in fact, the specification describes the network management system as performing a broader array of functions. STV Asia appears to concede that the network management system does more than just "selecting and scheduling" material but asserts that its construction should be adopted because it will "assist the trier of fact." Reply at 9.

STV Asia stipulated at oral argument that it does not dispute Defendants' use of the phrase "a combination of hardware and software components" in their proposed construction.

With respect to the first disputed issue – the location of the network management system – the Court concludes that the network management system is based in the distribution center and that there is only one distribution center. The section of the specification that describes the network management system does not directly address where it is located. *See* '069 patent, col. 9, l.31 - col.

United States District Court
For the Northern District of California

10, l. 67; col. 10, ll. 32-35. However, Figure 1 of the '069 patent shows the network management center – as well as the technical operation center and the earth station – inside the distribution center. *See also* '069 patent, col. 5, ll. 25 - 29 ("In the preferred embodiment, as illustrated in Fig. 1, the distribution network includes a distribution center 100 (technical operation center 200, earth station 234 and network management 261) and a receiving site (receiving system 254)"). Further, the Summary of Invention, which describes the invention as including "a network management system which forms playlists for each of the receiving sites in response to inputs from a user," specifies that "the user [is] located in the distribution center." '069 patent, col. 2, ll. 44-49; *see also* '069 patent, col. 5, ll. 8-11 ("In the preferred embodiment, users enter the desired playlists for each receiving site into the system from the technical operation site"); '069 patent, col. 5, ll. 25 - 29 ("In the preferred embodiment, as illustrated in Fig. 1, the distribution network includes a distribution center 100 (technical operation center 200, earth station 234 and network management 261) and a receiving site (receiving system 254)"); '069 patent, col. 9, ll. 27-30 ("The network management software allows the user located in the technical operation center to make quick modifications based on the actual product movements in each of the stores"); '069 patent, col. 9, ll. 32-43 ("The network management system determines what is to be displayed at each of the retail stores along with when it is displayed. Moreover, the network management system monitors which clips are located in each receiving site and which additional clips are required in each receiving site to display the desired programs. This information is then used to determine which clips will be sent from the distribution center to each receiving site"). Finally, claim 15 supports the conclusion that the network management system is based in a single distribution center: that claim calls for a "distribution center for transmitting video program segments to a plurality of receiving sites" and states that "the network management system control[s] which video program segments are sent to each of the receiving sites."

With respect to the function of the network management system, the Court declines to adopt STV Asia's proposed construction to the extent it describes the function of the network management system as "selecting and scheduling audiovisual material." While it is true that this is the *main*

function of the network management system, it does not encompass *all* of the functions served by the network management system and therefore is too narrow.

The Court construes this claim term as follows: "a combination of interacting hardware and software components that manage the network from a single distribution center."

**3) "user" (claims 1, 15, 16)**

STV Asia asserts that the word "user" should be given the plain meaning of the term, that is, "an individual who utilizes the network management system." Defendants, on the other hand, argue that the inventor gave the term a special meaning in the specification and therefore, that the term "user" in the '069 patent means "a person located in the distribution center who has access to the product movement information from the receiving sites." The Court agrees with Defendants.

In the Summary of Invention, the inventors state that "[t]he user, located in the distribution center, has access to the product movement information." '069 patent, 2: 49-50. This statement is made in a paragraph that begins, "The present invention is . . ." Where the inventor has made such a clear statement about the nature of his invention and in particular, the meaning of the word "user" as it is used in the '069 patent, it would be improper for the Court to adopt a broader definition, even if a "user" might well mean "an individual who uses" when that word is used in a more general context. *See Scimed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1341 (Fed. Cir. 2001) (holding that "[w]here the specification makes clear that an invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent, even though the language of the claims, read without reference to the specification, might be considered broad enough to encompass the feature in question").

STV Asia's reliance on *Bell Atlantic Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, in support of its position that the term "user" is not "*clearly* redefine[d]" is misplaced. 262 F.3d 1258, 1268 (Fed. Cir. 2001) (emphasis added). In *Bell Atlantic*, the court explained that while "the specification must exhibit an 'express intent to impart a novel meaning' to claim terms . . a claim term may be clearly redefined without an explicit statement of redefinition." *Id*. (citation omitted). Rather, "the specification may define claim terms by implication such that the meaning may be found in or ascertained by a reading of the patent documents." *Id*. (citation omitted). Indeed, in that

United States District Court
For the Northern District of California

case, the court upheld a claim construction based on the conclusion that a term had been implicitly defined in the specification, even though it was not expressly stated in the specification that the claim term was being given a special definition. *Id.* Similarly, the statement in the Summary of Invention quoted above defines the term "user" by implication.

This conclusion finds further support elsewhere in the specification, which makes clear that one of the main innovations of the invention is its ability monitor product movements in order to "more efficiently tailor its commercial messages to particular chains, stores, times of day and geographic regions." '069 patent, col. 3, ll. 35-37. If users – who create the advertising programs – did not have access to product movement information, they would not be able to accomplish this objective. Nor is there any suggestion in the specification that the preferred embodiments that are described would allow for users *without* access to product information.

The Court rejects STV Asia's argument that "user" should be construed more broadly based on the statement in the specification that "each user has a security level which allows that user access to certain programs." '069 patent, col. 12, ll. 2-5. The specification explains that the security level of the user determines whether the user will be allowed to create playlists or merely edit them. *Id*. There is no reason to conclude on the basis of this distinction, however, that "users" were intended to include individuals who do not have access to product movement information.

Finally, the Court rejects STV Asia's reliance on the doctrine of claim differentiation in support of its position. STV Asia points out that in claim 1, the user is expressly identified as "having access to the product movement information from the tracking system" whereas, in claims 15 and 16, no such limitation is included, arguing that this means that the term "user," by itself, does not mean an individual who has access to product information. Under the doctrine of claim differentiation, different claims are presumed to be of different scope. *Inpro II Licensing, S.A.R.L. v. T-Mobile U.S.A., Inc.*, 450 F.3d 1350, 1354 (Fed. Cir. 2006) (citing *Tandon Corp. v. United States Int'l Trade Comm'n*, 831 F.2d 1017, 1023-24 (Fed. Cir. 1987)). However, "describing claim elements or limitations in different words does not invariably change the scope of the claim." *Id.* Rather, the scope of the claims must be determined in light of the "description in the specification, as well as the prior art and the prosecution history." *Id*. (citing *Phillips*). Thus, for example, in

United States District Court
For the Northern District of California

*Inpro*, the Federal Circuit held that the district court correctly construed the term "host interface" in the disputed patent to require "a direct parallel bus interface" even though some of the claims expressly referred to such a limitation while others did not. *Id*. at 1357. The court reasoned that a host interface with a direct parallel bus interface was the only type of interface described in the specification and pointed to the inventor's statements emphasizing the importance of the parallel bus interface. *Id*. at 1355. Similarly, in this case, the specification describes *only* a user with access to product movement information, and such access is an important feature of the invention to the extent it allows for effective customization of programs for the individual receiving sites. The Court concludes that even though the claims, when read in isolation, might be read to support the broader construction of the term "user" proposed by STV Asia, when the claims are read in the context of the specification, it is clear that a more limited construction is appropriate.

The Court construes this claim term as follows: "a person located in the distribution center who has access to the product movement information from the receiving sites."

**4) "playlist" (claims 1, 15, 16)**

STV Asia asserts that "playlist" means "program selection." In its Reply, it proposes in the alternative, "a list of selected audiovisual clips" or "selected audiovisual clips." Defendants assert the term should be construed as follows: "a list of video clips that are to be displayed at a retail store or stores. The playlist is created by a user who is located in a distribution center." The parties agree that a "playlist" at least includes the ordering or sequencing of audiovisual material. They disagree, however, as to whether a "playlist" also includes the sequenced audiovisual material itself. STV Asia asserts that it does, while Defendants argue it does not.

Defendants assert that the term "playlist" is defined in the specification and that that definition should be adopted by the Court in construing the term. In particular, the specification states that "[p]laylists are lists of video clips that are to be displayed at each of the retail stores," '069 patent, col. 9, ll. 44-45, and that "a playlist is a particular program sequence requested by a user who is located in the distribution center." '069 patent, col. 2, l. 67 - col. 3, l. 2.

STV Asia, however, points to the latter statement as evidence that the playlist includes not only the sequencing of audiovisual materials but also the actual audiovisual materials themselves. It

United States District Court
For the Northern District of California

also points to the following statements in the specification that it asserts support such a dual meaning of the term:

- "The Playlist Database has . . . a contents table for each playlist that gives information on the clips (e.g. clip sequence number) included in each playlist." '069 patent, col. 11, ll. 16-24.
- "When playlists or [sic] created or updated, the program determines which additional video clips are needed at the stores and sets a pending flag." '069 patent, col. 12, ll. 17-20.
- "After the clips have been received and stored in the receiving sites, the system's software scheme performs the on-line program formation automatically in order to form the playlists. In the preferred embodiment, users enter the desired playlists for each receiving site into the system from the technical operation center. The user may enter one set of playlists for many stores, etc. For each individual receiving site, the software assembles the desired playlist with the clips stored in that receiving sites, and then forwards the clips to monitors for display." '069 patent, col. 5, ll. 5-15.

STV Asia also points to the usage of the word "playlist" in the claims. In particular, STV Asia asserts that while claim 16 appears to use the term "playlist" to refer only to include the *sequencing* of the audiovisual material, claims 1 and 15 use the term in a manner that suggests it may include the sequencing *or* the content.

A number of the citations to the specification offered by STV Asia in support of its proposed construction are not persuasive. It is unclear, for example, why the statement "The Playlist Database has . . . a contents table for each playlist that gives information on the clips (e.g. clip sequence number) included in each playlist" shows that the "playlist" includes the content of the playlist. *See* '069 patent, col. 11, ll. 16-24. Similarly, the statement "When playlists or [sic] created or updated, the program determines which additional video clips are needed at the stores and sets a pending flag" does not provide strong support for STV Asia's position. '069 patent, col. 12, ll. 17-20.

Nonetheless, the Court finds support for STV Asia's proposed construction in at least one statement in the specification, found in col. 5, ll. 5-15 (quoted above), and in claim 1. In both

places, the inventor appears to have used the word "playlist" as a shorthand to refer to the assembled audiovisual clips on the playlist. Claim 1 refers to a "network management system forming playlists" and "display units for displaying the playlists." While the first usage of "playlist" appears to refer to the list of audiovisual clips, it seems fairly clear that the second use of the term "playlist" refers not to the sequencing of the clips but rather, to the assembled audiovisual clips themselves. Similarly, when the specification states that the software "assembles" the "playlist with the clips stored in that receiving site," '069 patent, col. 5, ll. 13-14, the common-sense reading of that statement is that the "playlist" is the audiovisual clips themselves.

In reaching this conclusion, the Court is mindful of the general presumption that "the same terms appearing in different portions of the claims should be given the same meaning unless it is clear from the specification and the prosecution history that the terms have different meanings at different portions of the claim." *Fin Control Sys. PTY, Ltd. v. OAM, Inc.*, 265 F.3d 1311, 1318 (Fed. Cir. 2001). Here, however, the Court concludes, based on the description of the invention in the specification, that the inventors used the term "playlist" both to refer to the sequencing of audiovisual material and as a shorthand for the sequenced material itself. In particular, when the inventors used the phrase "displaying the playlists" in claim 1, they were referring to the audiovisual clips themselves. All other references to "playlists" in the disputed claims are to the sequencing of the audiovisual clips.

The Court construes the claim term "playlist" as follows: "a particular program sequence requested by a user who is located in the distribution center." The Court construes the phrase "displaying the playlists" as "displaying the audiovisual content listed in the playlists."

**5) "the network management system controlling when the video program is forwarded to the display unit for display" (claim 15)**

Defendants argue that this term means "the network management system determines the specific time at which the video program is forwarded and displayed at the display unit of each of the receiving sites." In support of their position, Defendants cite to the specification and an exchange in the prosecution history. STV Asia argues that this term needs no further construction beyond that which is required for the term "network management system" and further objects to

United States District Court
For the Northern District of California

Defendants' proposed construction to the extent it limits the term to a "specific time." According to STV Asia, this limitation is not supported by the specification and results in an overly narrow construction of the word "when." In particular, STV Asia asserts that requiring that "when" mean a "specific time" is inconsistent with the "wheel" concept that is described in the specification. The Court concludes that Defendants have the stronger position.

Defendants assert that their proposed construction is consistent with both the ordinary meaning of the word "when" and the specification. In particular, Defendants cite the Merriam Webster dictionary, which defines "when" as "**a**: at or during the time that : WHILE <went fishing ~ he was a boy> **b** : just at the moment that <stop writing ~ the bell rings>." They also quote the specification, which explains that one of the benefits of the invention is its ability to "more efficiently tailor its commercial messages to particular chains, stores, times of day and geographic regions." '069 patent, col. 3, ll. 36-40.

STV Asia argues that "when" doesn't mean a specific time because that construction is inconsistent with the wheel system described in the specification. Yet it is not clear why use of a wheel system would be inconsistent with Defendants' proposed construction. The specification describes the wheel system as follows:

> A "wheel" concept is used to handle the high volume of commercials and other programs which are displayed in the stores. A wheel is a cycle of time that represents the format of what will be shown on the television in the stores. For example, if the wheel cycle is three hours, then every three hours the display would repeat itself. The network management system provides the cycling needed for this wheel concept. Multiple wheels per day allow the system to establish playlists for the entire day. Additionally, the wheel format simplifies the contract, invoicing and billing required because these can be initially based on the original wheel(s) and later changed based on the actual number of plays. Rates may be sold and set by the wheels.

'069 patent, col. 9, l. 64 - col. 10, l. 9. Given that the network management system itself creates the playlists and determines the length and content of the wheels, nothing in the above description suggests that the network management system's use of the wheel system is inconsistent with Defendants' proposed construction. To the contrary, it is apparent that the network management system does control the specific time at which video programs are forwarded to the display units.

United States District Court
For the Northern District of California

The Court construes this claim term as follows: "the network management system determines the specific time or times at which the video program is forwarded and displayed at the display unit of each of the receiving sites."

**6) "network management site" (claim 16)**

STV Asia proposes that this term be construed to mean "location of network management system." Defendants argue that the term means "a central location where the network management system is located." While the parties dispute whether the word "central" should be included in the Court's construction, the issue that divides the parties is really whether or not the term refers to a *single* location or rather, allows for multiple locations. Defendants concede that nothing in the language of claim 16, where this claim term is found, requires that the "network management site" must consist of a single location. They assert, however, that the specification describes an invention that has only one network management site and nothing in the specification permits or suggest that the invention encompasses a video distribution network with multiple network management sites.

The Court has addressed this dispute in its discussion of the term "network management center," in which it concluded that the network management system is located in the distribution center and that there is no indication in the specification that there may be multiple distribution centers across which the network management system may be spread. For the same reasons, the Court concludes that the "network management cite" is limited to one location in the distribution center.

The Court construes this term as follows: "a single location from which the network is managed."

**IV. CONCLUSION**

For the reasons stated above, the Court construes the disputed terms as follows:

| CLAIM TERM | COURT'S CONSTRUCTION |
|---|---|
| **"network-wide program" or "network-wide video program" ('416 patent, claims 1, 9, 38, 38)** | a preassembled audiovisual program that is sent to every store location in the media distribution network. |
| **"market specific segments" ('416 patent, claims 1, 9, 38, 39)** | individual audiovisual segments designed for specific markets within the network. |

United States District Court
For the Northern District of California

| | |
|---|---|
| **"means operative when the destination address matches the associated address of the receiving site for inserting the market-specific segments into the network-wide video program" ('416 patent, claim 1)** | Function: "inserting market-specific segments in the network-wide video program."<br><br>Structures: decoding and switching system, element 12; digital data separator, element 54E; insertion control unit, element 56; video storage bank, element 72; routing switcher, element 74; switching command decoder, element 54C; multichannel output switcher, element 54D; data separator and buffer, element 58; control channel data buffer, element 60; processor, element 62; non-volatile memory units, elements 64 and 66; dial-up serial interface, element 68; software of the insertion control unit, element 56; receiver, element 54, source channels. |
| **"transmitting" ('069 patent, claims 1, 15, 16)** | distributing by sending by an electronic signal |
| **"network management system" ('069 patent, claims 1, 15)** | a combination of interacting hardware and software components that manage the network from a single distribution center |
| **"user" ('069 patent, claims 1, 15, 16)** | a person located in the distribution center who has access to the product movement information from the receiving sites |
| **"playlist" ('069 patent, claims 1, 15, 16)** | a particular program sequence requested by a user who is located in the distribution center |
| **"displaying the playlists" ('069 patent, claim 1)** | displaying the audiovisual content listed in the playlists |
| **"the network management system controlling when the video program is forwarded to the display unit for display" ('069 patent, claim 15)** | the network management system determines the specific time or times at which the video program is forwarded and displayed at the display unit of each of the receiving sites |
| **"network management site" ('069 patent, claim 16)** | a single location from which the network is managed |
| | |

IT IS SO ORDERED.

Dated: February 15, 2006

JOSEPH C. SPERO
United States Magistrate Judge

United States District Court
For the Northern District of California